Our last case for the morning, United States v. Gatrel. Ms. Young, you may begin whenever you're ready. Ms. Young, you may begin whenever you're ready. Good morning, Your Honors. I'm Kathryn Young from the Federal Public Defender's Office for Appellant Matthew Gatrel. I'd like to reserve about five minutes of my time, and I will watch the clock. Mr. Gatrel was convicted of violating the Computer Fraud and Abuse Act, which prohibits knowingly causing the transmission of a program, information, code, or command, which intentionally causes damage to a protected computer. His conviction was around the website DownThem, which allegedly involved distributed denial of service attacks, and AmpNet, which was a subscriber, a rental of subscriber, a subscriber, server subscription service. The first argument I want to turn to, unless the Court has any further direction I want to give me, is Mr. Gatrel's claim that there was insufficient evidence to support his convictions. Mr. Gatrel moved at the close of the government's case for judgment of acquittal on all counts and each and every element of the counts under Federal Criminal Procedure 29, so he could preserve this claim. So turning to that issue, the data produced by the case agent and examined by the government's expert conclusively established that Gatrel knew that the website did not have the power to cause damage. So Gatrel contends that his convictions must be reversed. He was convicted of conspiracy, causing or attempting to cause damage to protected computers, but after six years of investigation, the government was incapable of producing evidence of damage to even one single computer. Thus, the government failed to prove the essential element that Gatrel intended to damage any computer. Instead, the government's evidence established that Gatrel could not have attempted, attempted, aided or conspired to damage any computer, because the government's own evidence conclusively established that the websites had no power to do so. And going back for six years prior to trial, the FBI repeatedly tested the capability of the websites. In 2015, the testing was inconclusive, and the FBI was unable to produce any data from those tests. In June 2018, the FBI again attempted to test down them, but the website was not working. FBI tests were purportedly conducted on July 20, 2018, but the FBI could not produce any data from that testing. The only data produced at trial was from tests on July 18, 2018, and that data conclusively established that down them did not qualify as a booter or stressor service under the government's expert's own definition. And since down them utilized AmpNode servers, the government's own evidence established that AmpNode was equally powerless. Now, FBI S.A. Peterson first tested down them in December 2015, almost six years before Gatrel was tried. Peterson received copies of the website database in November 2018, three years before trial. But at trial, the FBI was still incapable of producing any evidence of damage. Instead, Peterson's six-year investigation revealed that most of the time down them did not work, and when it did work, it offered at most seven-one-thousandths the power of the lowest end of stressor services, as defined by the government's own expert, Smetanoff. But wasn't that just a measurement over a brief five-minute window? It was testing over a certain period of time that was broken into five-minute windows, and that was the only evidence of testing down them, the only evidence of concrete results of testing. How are we supposed to interpret that kind of data? That's the only data that we have to interpret. That's the government testing the websites and their own conclusions about how the website works. And their own expert testified that it produced something like 37.3 megabits or megabytes. I keep on confusing those terms. When the government's expert testified that in order to constitute a stressor service, you have to have five gigabits or up to 10 or 20 or 40 gigabytes. Well, does it have to work, or isn't it enough that he attempted to sell this service for purposes of crashing servers? I understand, Your Honor. Our point is that this website was so ineffectual that he could not have believed that it would work, that he did not believe that it would work. What was he doing? Your Honor, it's not in the record. He didn't testify, so it's not in the record what he thought he was doing. And since he explained that he thought he had software built into the website that would prevent them from doing damage, that he himself was involved as a full-time caregiver, he had a dog training business. He thought that the website was for testing, and that's what he intended it to be for. He was involved in other aspects. He had, as I was saying, he had full-time jobs and other pursuits, and he also had debilitating and degenerative illnesses. So he left this to the admins, the administrators, and they were the ones that were involved in many of these communications. The communications were never identified as to who they were from, so we don't know necessarily who they were from, Mr. Cottrell. So he understood that the website precluded from causing damage and was limited in what it can do. And in terms of what it was selling, there are representations on the website that Your Honor is talking about, and we contend that the claims of damage, like you were talking about the CBC Canada website going down that Andy Rack mentioned, that was never approved by the government, but it did go down at trial. And at sentencing, the government produced a chronology from CBC Canada, and CBC Canada laid out Andy Rack's attacks, and there's no evidence that CBC Canada produced that the website went down. So we think that all of these claims of the website of damage were self-promotion, self-aggrandizement, trying to... What about his work or association with Mr. Pukowski? Pukowski. I think at trial the only thing was proof that they had e-mails back and forth that Pukowski was trying to buy items from the websites. So it wasn't that he was not involved in Mr. Pukowski's operation. But his operation launched 60,000 attacks. Yes, and that's one of the things that we've objected to, because we think that was prejudicial, because Mr. Guttrell, we don't even know who was communicating with Mr. Pukowski, but Mr. Guttrell was not involved in that operation. Well, the government would argue that he was a co-conspirator. And if he was in fact a co-conspirator, then that would be admissible and certainly relevant. Yes. It may be prejudicial. Well, we disagreed because we didn't think that the evidence rose to conspiracy, because the evidence only showed that Pukowski was buying things. The communications didn't even identify who they were from. It was from Taco Red Quantum. So Mr. Guttrell or whoever was responding on behalf of the websites didn't even know who they were dealing with. You argued that, but the jury didn't buy your argument. So, I mean, our standard review is no reasonable juror. No reasonable juror could find Mr. Guttrell guilty of the two counts. Isn't that a very, very heavy burden for you to overcome? Yes, it is, Your Honor. And we think we've met it by the government's own evidence showing that the websites were incapable of producing damage. So unless there are any further questions on that issue, let me move on to the issue that we raised regarding jury instruction error. To prove violation of 1030C4BI, the government was required to prove that Guttrell knowingly caused the transmission of a program, information, code, or command, and as a result of such conduct intentionally caused or would have caused in an attempt, without authorization, damage affecting 10 or more protected computers during any one-year period. The defense requested a jury instruction on unanimity that the jury be required to identify each computer. The government opposed and the district court denied the instruction. However, we argue that a unanimous verdict was required in this case for various reasons. We relied on this Richardson Supreme Court case in which the United States... Yes, yes. Yes, Your Honor. No, I think the jurors did agree on that. We asked for unanimity as to... Yes, you're right, Your Honor. I apologize if I misspoke. The jurors did unanimously agree that 10 computers were damaged. At trial, we asked the court to ask them to agree unanimously as to each of the 10 computers that were damaged. And we relied upon the Supreme Court case in Richardson where the Supreme Court addressed the statute forbidding any person from engaging in a continuing criminal enterprise. The Supreme Court said that the jury must unanimously agree upon which specific violations make up the violations comprising the continuing criminal enterprise. The jury must unanimously agree not only that the defendant committed some continuing series of violations, but also that the defendant committed each of the individual violations necessary to make up the continuing series. Yes, Your Honor. Well, I think in this case, it's an element of the offense, which is what Richardson said you have to have unanimity on. And I think it would have been important in this case because Mr. Cattrall tends that no computers were damaged. And if the jury had to focus on identifying computers that were damaged, we contend that they would have had to acquit him because there were no computers that were damaged. It's not likely that another... That's what it feels like. Yeah, I understand, Your Honor. Our position is that if they had to focus on identifying each computer that was damaged, they wouldn't be able to identify a computer that was damaged.  would be able to identify a computer that was damaged. It involves the same set of facts, but it's a different legal issue because we're relying upon the Supreme Court law that if it's an element of the offense, there should be jury unanimity required as to that element. Okay, unless there are any further questions on that issue, let me move on to the issue of improper venue. The indictment alleged that Martinez, a co-conspirator,  And that was the basis of venue in California. Mr. Guttrell had always lived in Illinois and had never been to California and had no contacts with California. Martinez, however, did not testify as anticipated at trial, and therefore we contend that there was no basis established at trial for venue in California. Now, the government contends that when the FBI met with Martinez in the Central District, Martinez gave S.A. Peterson a copy of the download database, and they rely upon that encounter. And the testimony of S.A. Peterson to establish venue, since Martinez did not testify. However, we contend that Peterson's testify did not establish that Martinez resided in the Central District. Peterson and his investigative skills were established previously because he had tried to find Guttrell, and he generated the wrong address for Guttrell, obtained a search warrant for an address that was not Guttrell's address, and executed a search warrant at an address that was not Guttrell's address. Peterson then testified that he used the same investigative techniques to locate Peterson. And when he was testifying about locating Peterson ostensibly in the Central District, he equivocated in his testimony. We argue that it's not, Your Honor. First of all, that's a variance from the indictment, which we contend they can't do. But secondly, the computers in the Central District of California were universities, large institutions that absolutely even the government admits could not have been affected by download. So in that case, it would have to be not a damage, but an attempted damage. And in an attempt offense, the venue is where the attempt occurs. So it would have to have been where if Guttrell was the one who was trying to attack the computers, it would be where he was located when he attacked the computers. So if you're talking about the attacks on computers in the Central District of California, there were large institutional computers. That could only have been where the attempt was made, which was not established in the Central District of California. So we argue that that could not have provided a basis for venue. Have I answered your question? Yes. The basis that we cite is that the Martinez used, the indictment alleges that Martinez used a computer in California, which is ER 2580. There was no evidence in the trial record that he used a computer in California. Peterson testified that he went to the residence that he believed was Martinez. And in fact, it was Martinez's mother's residence. And it was after. If it had been shown that he was using it for the offense and at the time of the offense. Because when Peterson encountered Martinez in California, it was a month after the offense. Was there a motion attacking the venue pre-trial? Was one filed? Yes. Yes, Your Honor. There was? Yes. Okay. I see my, I'm running into my six minutes of rebuttal. So is there any further questions? Thank you. Schroeder. Good morning, Your Honors. May it please the Court. Cameron Schroeder on behalf of the United States. I want to start by just acknowledging that while, Your Honors, you may have a very good grasp of the complexities of this case, I think there's a tendency to think computers, it's complex, it's hard to understand. We're just talking about D-stats and megabits per second and gigabits per second. But really this is a simple criminal scheme whereby the defendant set up a service to essentially democratize computer crime and computer attacks and made it available to thousands of users all over the world and to allow them to attack victims all over the world, thus causing the operation of the Internet to be affected in ways that affect us all and cause us to pay more for Internet service. We've all experienced the delays and lags that we can see, particularly during the pandemic when we were all on Zoom. I'm sure we all have personal experiences with the functionality of the Internet being important to our lives. But I want to focus, of course, on what the standards are here, what the jury heard, and what the issues are before this court. So I think the first thing I do want to put out there is I don't believe that the arguments, all the arguments that are made today, were preserved. I think this court's case law is clear that, for example, if a defendant raises a claim in mid-trial on a Rule 29 motion and doesn't renew it in a post-trial motion, that claim is not considered preserved. I think it's not incredibly important in this case, because whether we're talking about plain error or we're talking about conserving all the evidence and the like most favorable to the government and determining whether any rational fact finder could find in favor of the government, it doesn't make a material difference. But I do just want to highlight that I don't think the arguments were preserved. I do want to focus on, I think we take particular issue with how the defense frames the proof in this case. And they focus on a particular small part of one witness's testimony that involves some math done on the fly regarding the FBI's testing. And I want to clarify the FBI's testing a little bit. So as the jury heard, the FBI did some initial probing testing in 2015 just to see if the website seemed to work. It seemed to work. They got pulled into other more urgent matters. They came back in 2018 to focus on this site and others. And their testing was to determine what websites they should focus on. Did the website function? They were not trying to damage computers. They were trying to see if I use this website and I put in an IP address and I press start, is an attack launched? Is it launched at the time that I say? Is it launched under my username? And is it launched under the kind of attack type that I requested? Does the site work? And that is what they determined, and that is why they focused on going after this website in particular. They weren't going to waste their time focusing on websites that didn't do anything. So they were not attempting to test the power of the website because that would have involved putting computers at risk not only on the receiving end of the data, but on the entire data flows that went from defendants' attack servers to the third-party vulnerable servers out there on the Internet that he abused in such a way that you could send a small request pretending to be your victim and get a large request in response. So all of those computers were forced to send data whenever a defendant submitted a request from one of his attack servers, and they were forced to send that to the victims. So the FBI was not interested in trying to find out how damaging defendants' website could be because that would have caused damage across all of the traffic nodes that that traffic would have had to travel. So we don't want to overstate what that testing was designed to achieve, particularly in light of all the other evidence that the jury heard. And one of the things I want to focus on is defendants' admissions. The FBI interviewed the defendant. He consented to an interview. They had originally gone to a house where he also spent time and where he was also using the IP address to access his services. So he had two places where he spent time. They went to the first one. Family and friends lived there. He wasn't there at the time. They went to the other one because they didn't have a search warrant for that place. They knocked on the door, asked if they could come in, conducted a consensual interview with him. And he said, yes, I run AMP node and down them. And he said, I know my customers are using it for malintent. That was his word. And he knew that they were running DDoS services themselves using his AMP node service. He said he knew that at least 50% of his AMP node customers and possibly more were using it to run their own DDoS for higher services. And he discussed in detail one particular person that he knew was running the service IP stressor, and he'd known that person a long time, and he knew that that person was using AMP node to run his own stressor booter service. He was aware that his conduct was risky. And, in fact, he said, when Agent Peterson said, is there a way for you to run AMP node without facilitating DDoS? Is there a way for you to run it legally? He said, well, I'd have to get rid of the AMP lists. And so defendants suggested that AMP lists are somehow an okay thing to use. There is no legitimate purpose for AMP lists. And the jury heard nothing to suggest that there was. The defendant himself said, I would have to get rid of the AMP lists, which are these lists of the vulnerable nodes out there on the Internet that he used, that he conscripted to run his services, and I would have to get rid of the DStats. And the DStats, as the jury heard, were a way of measuring how much traffic you were generating from your attack server. And he provided a service to his customers to show why the service functions. Look at this DStat. And he provided screenshots of those to customers. He had a customer do a third-party DStat test on one of his servers. And the customer came back, I think, with 9.8 gigabytes being transmitted. So he knew that what he was doing was illegal, that other people were using it for illegal services. He was facilitating those services, and that in order to make his own website work lawfully, he would have to get rid of certain functions on it. And he said in communications with customers and with his co-admin that he was aware that it was illegal. He said to a customer, it shouldn't be legal anywhere. And here, it's definitely not legal in the U.S. He said, it's cyber-terrorism if you're caught here. So he knew exactly what he was doing, the risks he was taking, and that if he got caught, it was going to be a real problem for him. He also communicated consistently with his customers, proving that his down them site worked. He consistently would send these screenshots showing he had run an attack on an IP address that the customer had provided, and that he was able to cause that computer to stop being able to communicate. They sometimes say the computer pinged out. He would attach the screenshot that showed, first, here's the attack that I launched, and then here's the response from the computer, which is saying connection timed out, connection timed out, connection timed out. Let me stop you a second. Yes. You know this case so well. You tried this case. I did. You're a real expert on it. Let's assume that Mr. Guttrell was aware that down them and AMP node were ineffective. Okay. Okay. And that's what he came out and claimed, that that's what the evidence shows, that they were ineffective. Could a jury still convict him of the charges for which he's charged? If he knew they were ineffective. I take your honors hypothetical, and I would say I disagree with the premise of it. If he knew they were ineffective, his customers were still entering into an agreement to commit these attacks, still believe they were getting a service that was going to conduct attacks. Now, if, and there's also his co-administrators. So it's, I don't know if we take him out of the equation entirely, that we solve the problem for down them, because his co-administrator, one of his co-administrators, Martinez, also used the service, used it to conduct his own attacks, you know, chose his plan, provided service to Guttrell so that he could use the service for free. So he was facilitating customers. He believed he was conducting DDoS attacks. They believed they were conducting DDoS attacks. I suppose, did the defendant enter into an agreement? Did they have a meeting of the minds that they were conducting crimes? That was certainly not the argument made to the jury, and they didn't hear any evidence in that regard. So I would, I think, you know, respectfully, I think that hypothetical doesn't fit the trial. Okay. So your argument would be that they merely argued that the evidence didn't show that they were effective. Correct. And I think they disregard substantial portions of the evidence to try to make that argument. They would have you, in order for that to be true, and the jury found that it wasn't, you would have to believe that not only was Defendant Guttrell running a massive fraud, but that his own administrator, who could see behind the curtain, was using it himself to conduct attacks, but somehow believed there was no point in doing that, and he was providing his services in exchange for something he wasn't getting. I'm not sure I fully understand what it is that AMPnode sold, but it's described in certain parts as components. It's an important distinction because the down them service was this, you know, service for hire, right? You didn't have to have any technical expertise. You just had to have an IP address. They did the work for you. They did the work for you, and they gave you suggestions, and they would help you if you were having trouble. And that was the one that he had co-administrators on. His main co-administrator, Juan Martinez, the co-defendant, who helped him towards the end developing the website and making things work better. His AMPnode site, he was the only one who ran that, and the jury heard no evidence suggesting anything otherwise. He answered e-mails that went to him. It was not a situation where there was a ticketing system. I mean, there were tickets, but the correspondence that they heard. He sold these products. And so in that website, he sold servers that could be leased servers that could be used to launch attacks. That was their purpose. They could be used for other things. They could be used for other things. But his customers were buying them, requesting the other components that included AMP lists. And as I said, there's no legitimate purpose for purchasing an AMP list. Would a server be of any value? It would, yes. If you had an AMP list in your own server, you could use that AMP list to conduct your own attacks. He would say, I'm a one-stop shop. I'll give you the server. I'll give you the AMP list. I'll give you the attack scripts because you have to have a computer program to make the attacks launch. And I'll provide you with the spoofing servers, which are hard to find because not very many server provider companies will allow you to spoof for the reasons we see in this case because it allows you to appear to be somebody you're not. That allowed him to say, I'm a victim. I'm some other IP address. Please send me a bunch of data. I guess I'm trying to analogize this product that he serviced, selling through AMP node to someone who has a firearms store and sells firearms. And, you know, he knows that some people are going to use his firearms for defense. Some are going to use them for hunting. And he probably knows some are going to use them to go out and kill people. Is he liable for murder? I think there's a question of how much intentionality and agreement there was there. And I think, you know, he said at least 50% of my customers are using my servers to run their own criminal services. I mean, he used the term DDoS for higher services, but those are criminal services. So maybe in the sense that, you know, he might have had an agreement at that point to facilitate the commission of other crimes. But I think the devil's in the details a little bit there. You know, I think there was an analogy that if you give somebody a gun to go rob a bank, you know, have you conspired to rob the bank? Depends on what you knew. There could be something. There could be something there. He looks more like an internet merchant who has all kinds of products that he's selling. He has certain kinds of products. And I think because the jury heard at trial, he was sort of holding himself out as what's called a bulletproof hosting service, meaning I don't care what you do with my servers. He said as long as it's not zoo or child porn, that's where you drew the line. But most people don't need a bulletproof hoster. Most people will go to Amazon and buy server capacity or, you know, Google and buy server capacity. They don't need somebody like AmpNote. And because it's hard to get spoofing servers, they're going to cost more. You're not going to have the same kind of support if there are problems with them. So people doing normal things don't choose to go to a bulletproof hoster to get their servers. You have to want the things that are only provided in that system. So whether that's because you're selling firearms illegally or you're conducting DDoS services, there may be different reasons, but the defendant himself admitted that at least 50% of his customers and probably more were using him specifically to conduct their own DDoS services. And so his argument that they didn't work would require you to believe that those people kept coming back and paying for these extra expensive servers, for the Amplis, for the attack scripts, for the turnkey service he provided, even though it somehow just didn't work at all. And when he, in talking about Defendant Pukowski, the Alaska defendant who admitted for purposes of, you know, to the court for purposes of determining whether his co-conspirator statements could be admitted, he admitted that he was getting his servers from Mr. Jarrell. Did he know that Pukowski was convicted? He did not. Okay. We kept that from the jury. We just submitted it to the court for purposes of the threshold admissibility of his co-conspirator statements. But he bought Amplis every week from Mr. Jarrell and repeatedly bought the servers from him, and they discussed how to use them. Mr. Jarrell provided support for him, and they had a discussion about how Mr. Pukowski at one time was having trouble with the servers and he was concerned about whether it was because of his outgoing traffic. And Mr. Jarrell says unlikely unless you were straight dosing, meaning he wasn't using that spoofing mechanism where they could trace it back to him. So they both knew that if somebody could trace it back to him, it could be he could be shut down, but because of the kind of spoofing servers that Mr. Jarrell provided, he couldn't be shut down or he wouldn't be shut down. So that wouldn't be why there was a problem with the server. So I think, you know, in Mr. Tsvetanov's testimony, the defendant relies on so much, doesn't support his point either. Mr. Tsvetanov, the expert, said, you know, there's a lot more that goes into this than total bandwidth. And that's a point the defendant consistently ignores. He talks about how the packet count per second, that means how many data packets are coming across that line per second, is at least as important as the total bandwidth. And that's something that couldn't be measured in the data capture that Mr. Tsvetanov was doing math on on the fly because he only had a total amount received. He didn't have any way of seeing how fast they were coming in. And he said, you know, for certain types of attacks, it doesn't matter how large the packets are, but it matters how many of them are being sent per second. He talked about a company that was suffering outages on their network because of a very, very low-grade denial of service attack because it depends on how they're configured. And he said they have different modalities and dimensions. Most people just see them as bandwidth or how much traffic was transferred, but there are many other ways a website can be rendered useless. And defendant, and his co-defendant, Martinez, said the same thing to customers. You have to try different things. You have to find a vulnerable opening on the system. So the total amount is just one factor in how effective a DDoS attack can be, and that is the only thing the defendant focuses on. Mr. Tsvetanov also said, even after revising his numbers downward, that even at the lowest lower levels, a home connection was likely to be degraded. He said it's not definite they're going to suffer, but they are very likely going to suffer. And that was with the plan of the FBI trying not to cause damage to computers, to try to just test and see if attacks would even be launched. He consistently told his customers that they would get greater power with his corporate servers, and his corporate plan, and you could launch multiple attacks, and for longer periods using those plans which were not what the FBI tested. And as I said, they weren't trying to measure volumetric data flow. They were just trying to see if something would be launched, when they said it would be launched, to show that the attack tables were going to be accurate, and to show that people were getting what they paid for, at least things were launching when they expected them to launch. I do want to focus a little bit on if there are either questions the Court has on unanimity or venue. I don't want to leave those off the table. Perhaps if the Court has one, I'd like to focus on venue. So first of all, I want to emphasize that the standard for venue is, of course, preponderance of the evidence and, you know, on appeal, if any rational trier of fact could find it. So the objection was preserved on venue, yes, Your Honor. Martinez was a sufficient basis for finding venue in the central district, but as the Court has pointed out, it was not. That was not the only evidence the jury heard. I want to emphasize that I think the variance argument has no basis in law. A variance must concern an essential element of the crime. There's actually no need to plead venue in an indictment, and we pled that acts took place in the central district of California and elsewhere. There happened to be some over-the-accent involved for Martinez, but that was by no means the only allegation in the indictment. It would be, it's only an issue if there's prejudice to the defendant, and this didn't create some unforeseeable basis of liability or a new prosecution strategy that forced him to change his theory of the case like a variance might. He was informed of what he was accused of, and as this Court's prior decisions have said, you know, he has to be informed of what he is accused of doing in violation of the criminal law so that he can prepare his defense, and that's the Sinah-Hijene case, and also so that there's a bar to later prosecutions, and that's from Olson. So the purpose is double jeopardy and informing defendant of what crime he is accused of so that he can properly defend himself against it. Venue is a trial right, not a pleading right, and contrary to defendant's assertion, there was no pretrial motion made regarding venue. We certainly could have introduced substantially more evidence regarding venue if that had been raised pretrial. It wasn't raised until the government arrested him. You're saying it wasn't properly preserved. Well, it was not properly raised in a Rule 12 motion. They did object. They did raise it in their Rule 29 motion, and the Court did not decide that it was unable to consider it at that point. I think it should have been raised in a Rule 12 motion. I think their argument is that they didn't know exactly what the evidence would be until the government arrested. But either way, there's no essential element of the crime that's impacted here, and unlike, as the Court pointed out, the other cases, this defendant was tried in the proper venue. He had both Martinez here. Clearly the statements that defendant Martinez, co-defendant Martinez, made about where he was when they were talking about time zones, you know, when could they connect on a call, he says, it's 10 p.m. my time, Pacific time, I'm from L.A. And as the jury could tell from their other communications, defendant Martinez was not a native English speaker, so maybe it's a poor turn of phrase, but the point was, where are you so we can figure out what time we should talk on, and he says, I'm from L.A. Thank you, Ms. Schroeder, your time is up. Thank you. Thank you. Thank you. I'll be very brief. I just want to respond to a few of Ms. Schroeder's points. With respect to the fact that arguments were not preserved, Mr. Gutrell did file a Rule 29 motion as to each and every element of each count. He subsequently reiterated that the defense made a Rule 29 motion as to all elements, as to all counts, reiterated that twice. And Ms. Schroeder was talking about some of the communications that were made in attributing them to Mr. Gutrell, and I just want to mention again that there were four admins, and so not all the communications can be attributed to Mr. Gutrell, and the government did not identify which communications on the websites were from Mr. Gutrell and which were from the admins. Ms. Schroeder also referred to Mr. Svetlanov's testimony about how there's a lot more than bandwidth, and in that context he was talking about testing at methods like slow lowers and level 7, which were not offered by the website, so they could not have impacted the type of damage that the websites could allegedly have caused. She also characterized Mr. Svetlanov as testifying on the fly and making errors in calculation, but even after he recalculated and reduced it, it was still a very low number, and even then when he said this might cause damage, he still wasn't taking into consideration what he testified to was that the packets, the five-minute packets were not co-synchronous with the five-minute windows of the testing, and therefore each five-minute window didn't necessarily, he was saying it didn't necessarily capture how low a test would be, but it also would exacerbate how high a test would be, and that's set forth more articulately in our reply. And Ms. Schroeder also referred to the admins saying that you have to do different things with the customers, but they were just talking about different methods of trying to use the website in different ways because it wasn't working, and it still didn't work. And then according to my notes, also with respect to variance, we did cite a case that says it involves a variance of the indictment in the context of venue. So I think I've responded to everything. If there's any questions that the court has, I'll be happy to respond. No, thank you very much. Thank you very much. This matter is submitted, and that concludes our oral argument for this morning. Thank you, and we'll stand at recess.
judges: BYBEE, Fisher, DESAI